UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
MATRIX ESSENTIALS,

                Plaintiff,

-against-

QUALITY KING DISTRIBUTORS, INC.,
BERNARD NUSSDORF, GLEN
NUSSDORF, and STEPHEN NUSSDORF,

                Defendants.
----------------------------------------------------------------X

MEMORANDUM AND ORDER

CV 90-1070

(Wexler, J.)

APPEARANCES:

    BAKER & HOSTETLER, LLP.
    BY: GEORGE STAMBOULIDIS, ESQ.
        FERNANDO BOHORQUEZ, ESQ.
    Attorneys for Plaintiff
    666 Fifth Avenue
    New York, New York 10103

    BRACKEN, MARGOLIN & GOUVIS, LLP
    BY: LINDA MARGOLIN, ESQ.
    Attorneys for Defendant Quality King Distributors, Inc.
    One Suffolk Square, Suite 300
    1601 Veterans Memorial Highway
    Islandia, New York 11749-1543

    EDWARDS & ANGELL, LLP
    BY: ANTHONY VIOLA, ESQ.
        ANDRE K. CIZMARIK, ESQ.
    Attorneys for Pro's Choice and Ruth Nussdorf
    750 Lexington Avenue
    New York, New York 10022

WEXLER, District Judge

    The complaint in this action was commenced by Matrix Essentials, Inc. ("Matrix"), by way of order to show cause, on March 28, 1990. Named as Defendants were Quality King

1

Distributors, Inc., ("Quality King"), as well as the company's then-president, Bernard Nussdorf and his sons, Glenn and Stephen Nussdorf (the "Quality King Defendants"). Two months after filing of the complaint, the parties entered into a permanent injunction and consent order and the case was closed. The parties' agreement was "so ordered" by this court on May 29, 1990 (the "1990 Injunction").

Fourteen years later, on June 10, 2004, L'Oreal USA, Inc., L'Oreal USA Products, Inc., L'Oreal USA S/D, Inc. and L'Oreal Creative, Inc, (collectively "L'Oreal"), claiming to be the successors in interest to Matrix, presented this court with an ex parte order to show cause seeking an order of contempt for alleged violations of the 1990 Injunction (the "Present Proceeding"). In addition to naming the Quality King Defendants, the Present Proceeding names Ruth Nussdorf, Pro's Choice Beauty Care and GSN Trucking Corp. as "Non-party Respondents." These parties are alleged to be bound by the terms of the 1990 Injunction (collectively the "Pro's Choice Parties").

This court signed the June 10, 2004 order to show cause and ordered Defendants and Non-Party Respondents to appear before the court on June 16, 2004 (the "June 10 Order"). The June 10 Order restrained the Quality King Defendants and the Pro's Choice Parties from violating the 1990 Injunction and further restrained them from taking specific action with respect to certain products and business records.

In an order of the same date as the parties' June 16, 2004 appearance, this court lifted the injunction imposed by the June 10 Order. The court noted that the 1990 Injunction remained in effect as to the Quality King Defendants. However, reasoning that the Pro's Choice Parties were not named in the complaint herein, this court held that no injunction could be enforced against them. It was noted that L'Oreal was free to commence a new action against the Pro's Choice

Parties or to continue to press any legal theory deemed viable in an effort to prove that the Pro's Choice Parties are bound by the terms of the 1990 Injunction. The parties thereafter engaged in almost two years of discovery.

At the close of discovery, The Quality King Defendants and the Pro's Choice Parties moved, pursuant to Rule 60(b) of the Federal Rules of Civil Procedure ("Rule 60(b)"), to vacate the 1990 Injunction. All parties cross-moved for summary judgment. The court denied the motions because of the presence of issues of fact and scheduled a non-jury trial. The court bifurcated the trial as follows. The first phase of the trial would assume that L'Oreal had standing to enforce the terms of the 1990 Injunction and that the Pro's Choice Parties were bound thereto. The sole issues to be decided would be: (1) Defendants' Rule 60(b) motion to vacate the 1990 Injunction and, (2) whether L'Oreal's claim was barred by laches. The remaining issues, i.e., L'Oreal's standing, whether the Pro's Choice Parties were bound by the 1990 Injunction and whether that Injunction was violated, would be decided, if necessary, at a second trial.

Phase one of the trial has been completed and the parties have submitted proposed findings of fact, conclusions of law and legal memoranda. The court has considered those submissions and this constitutes the Court's Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

I. The Parties

   1. L'Oreal, assumed for the purpose of this phase of the trial to be the successor in interest to Matrix, is engaged in the business, inter alia, of manufacturing and distributing hair care products under the "Matrix" brand name. These products include shampoo and various conditioner and styling products.

3

2. Quality King distributes a wide variety of products to retail stores, including hair care products sold under various brand names.

3. Bernard Nussdorf, a defendant named in the complaint, was the president of Quality King, but is now deceased. Bernard Nussdorf and his wife, non-party respondent Ruth Nussdorf, founded Quality King.

4. Glen Nussdorf is the son of Bernard and Ruth Nussdorf and has been employed by Quality King since 1970. He is currently the Chairman and CEO of Quality King.

5. Pro's Choice is engaged in the business of distributing what the parties and witnesses referred to at trial as "professional" hair care products. Such products are routinely sold by Pro's Choice to stores where they can be purchased directly by the public.

6. Pro's Choice was spun off from Quality King in or about February 2001. Ruth Nussdorf is the current chair and owner of Pro's Choice.

## II. The 1989 Florida Action and the 1990 Complaint

7. In 1989, Matrix sued Quality King in federal district court in the state of Florida (the "Florida Action"). That action alleged that Quality King was making unauthorized sales of Matrix products. The Florida Action was settled in April of 1989. Pursuant to the settlement, Matrix agreed to buy back its products from Quality King.

8. On March 28, 1990, Matrix commenced this lawsuit against the Quality King Defendants. The complaint sets forth federal trademark claims as well as state law unfair competition claims. Specifically, the complaint alleges that Matrix products are sold by a network of distributors who are contractually obligated to

4

sell those products only to professional beauty salons for resale to salon customers. It further alleges that the Quality King Defendants obtained Matrix products and sold those products outside of the Matrix chain of distribution for direct sale to the general public.

9. The complaint here refers to the Florida Action and states that, contrary to the settlement agreement in that case, the Quality King Defendants did not sell all Matrix products in their possession back to Matrix but, instead, retained inventory of those products. It was further alleged that the Quality King Defendants continued to offer those products for sale to the public, in violation of the settlement agreement in the Florida Action.

III. The 1990 Consent Judgment and Permanent Injunction

10. Approximately two months after the March 1990 commencement of this action, the parties agreed to a settlement and entered into a consent judgment and permanent injunction. That agreement is referred to herein as the 1990 Injunction.

11. The 1990 Injunction was signed, on behalf of the Quality King Defendants, by Bernard, Glenn and Stephen Nussdorf.

12. The 1990 Injunction bars permanently the Quality King Defendants as well as their employees, successors and assigns, from, inter alia, purchasing, acquiring, distributing, selling or offering for sale any product manufactured or distributed by Matrix or bearing the Matrix name.

13. This court retained jurisdiction over this matter to control, enforce or implement the 1990 Injunction.

14. After entry of the 1990 Injunction and continuing until approximately 2002, neither Quality King nor any related entity engaged in the sale or distribution of products marketed under the Matrix name.

IV. Distribution of Matrix Products and the "Diversion" Market

15. L'Oreal labels its Matrix hair care products for "professional" use by stylists in salons.

16. L'Oreal advertises its Matrix products to the trade and trains hair stylists in the use of those products.

17. L'Oreal does not sell Matrix products directly to stores that sell hair care products to the general public.

18. L'Oreal sells Matrix products to authorized distributors. These distributors are, in many cases, contractually bound to sell Matrix products only to salons and beauty supply stores that sell products to hair care professionals.

19. Despite the fact that L'Oreal does not sell Matrix products to retail sales outlets that sell to the general public, the evidence at trial was overwhelming that such products are widely available at retail stores throughout the country. Those stores include nationwide food and drug retailers such as Stop and Shop, King Kullen, Target, Duane Reade, CVS, and Rite-Aid stores.

20. The public availability of Matrix products is made possible by sales referred to at trial as secondary market sales. L'Oreal refers to these sales as accomplished through the process of "diversion."

21. The diversion of Matrix products beyond the professional hair care market occurs when L'Oreal's authorized distributors sell Matrix products outside of the

6

professional chain of distribution. These sales are made to entities referred to as "collectors" or "jobbers," that stock large quantities of Matrix product. The product is then sold to companies like Quality King and Pro's Choice that, in turn, sell the product to retail sales outlets for sale to the general public.

22. As noted, many authorized Matrix distributors are contractually obligated to sell Matrix products only to salons for professional use by stylists. The sale of Matrix products outside of the authorized chain of distribution, either to collectors, jobbers or companies like Quality King or Pro's Choice, is a breach of the distributors' contracts with L'Oreal.

23. The amount of sales of diverted Matrix products, in units and dollars, was demonstrated at trial by introduction of data prepared by the AC Nielsen Company (the "Nielsen Data"). Nielsen Data showing the source of diverted product was also introduced at trial. The Nielsen Data is unbiased and based upon an analysis of millions of units of Matrix product. The court finds the Nielsen Data to be reliable.

24. The Nielsen Data showed that the number of Matrix units sold in the diversion market grew from approximately 1.6 million units in 2002 to approximately 6.4 million units in 2006. In terms of dollars, this represented approximately $18.4 million in sales in 2002, which grew to over $90 million in sales of Matrix diverted product in 2006.

25. L'Oreal receives Nielsen Data approximately every three months. In addition to detailing the amount of diverted product, the Nielsen Data reveals to L'Oreal the source of diverted product.

26. L'Oreal introduced its own analysis of the source of diverted Matrix product. L'Oreal's data was based upon a sample buying program that involved between 900 and no more than approximately 15,000 units. The Nielsen Data, on the other hand, was based upon millions of units of product. The court finds the Nielsen Data, showing source of diverted product, to be more reliable than the L'Oreal data.

27. The large scale of the diversion market and the reports available to and reviewed by L'Oreal make clear that L'Oreal is currently, and has in the past several years, been well aware of the diversion of Matrix products and of the growth of that market.

28. L'Oreal has the technology and ability to trace diverted products to particular distributors.

29. L'Oreal has had occasion to terminate distributors because of diversion of Matrix products. L'Oreal has not moved to terminate all distributors involved in the diversion market.

30. The court recognizes and credits testimony that termination of a Matrix distributor due to diversion is not a process that can be performed overnight. Instead, when L'Oreal contemplates termination of a distributor, it must first ensure that its customers have an alternate source of product.

31. Nonetheless, the court find that if L'Oreal wished to stop diversion of Matrix products it could do so by identifying the source of the diverted products and exercising its contractual right to terminate distributors that sell large quantities of Matrix products to collectors or jobbers.

32. To the extent that L'Oreal engages in business with distributors that are not bound by a "professional sale only" contracts, L'Oreal has the ability to enter into such contracts. L'Oreal's unwillingness to enter into or exercise rights pursuant to distributor contracts is evidence of its failure to pursue seriously a "professional use only" policy.

33. The court finds that L'Oreal has not engaged in activities aimed at large scale termination of distributors so as to end the process of diversion.

34. L'Oreal employees testified at trial that the company was committed to maintaining the professional nature of the Matrix brand. For example, L'Oreal's Vice President and General Manager of the brand testified as to the marketing of Matrix products to professionals and the importance of maintaining the product's placement in that market.

35. Charles Domroe, L'Oreal's Director of Security, testified as to his commitment, over several years, to ending the diversion market and his monitoring of distributors so as to stop diversion.

36. The court finds such testimony to be completely at odds with the reality of L'Oreal's business.

37. In light of the fact that L'Oreal has known of the magnitude of the diversion market for several years, the court finds any claim that L'Oreal is serious about ending diversion of its product to be without credibility. Instead, the court finds that L'Oreal is content to enjoy the profits associated with diverted product, while paying "lip service" to the notion that they are interested in protecting the professional nature of the brand.

## V. L'Oreal's Knowledge of the Sale of Matrix by Pro's Choice

38. Beginning in 2002, Pro's Choice began, and continues to date, to distribute hair care products sold under the Matrix brand name. Such products have been distributed by Pro's Choice to large retail stores for sale to the general public, including Target stores.

39. Matrix products sold by Quality King and/or Pro's Choice to retail sales outlets were neither expired, adulterated or anything other than genuine Matrix products.

40. L'Oreal first became aware of the possibility that Quality King and/or Pro's Choice was selling Matrix product in August of 2002.

41. L'Oreal did not move for an order of contempt in this action until June of 2004.

42. Instead of seeking court enforcement of the 1990 Injunction immediately upon obtaining knowledge of a possible violation, L'Oreal engaged in a series of maneuvers aimed at involving Federal law enforcement in their quest to stop Quality King and Pro's Choice from engaging in the sale of Matrix products.

43. L'Oreal's attempt to involve federal law enforcement in this matter included arranging for meetings to be attended by representatives of the United States Attorney's Office, the FBI, and L'Oreal's current outside counsel. Such meetings were aimed at convincing the federal office to bring criminal charges against Quality King and Pro's Choice for distributing Matrix products in alleged violation of the 1990 Injunction.

44. L'Oreal's attempt to convince federal officials to commence criminal proceedings included sending a proposed criminal indictment, drafted by L'Oreal's outside counsel (a former federal prosecutor), to be used in a federal criminal action. In

10

addition to charging criminal contempt for violation of the 1990 Injunction, the proposed indictment set forth criminal mail and wire fraud violations as predicate acts in furtherance of an alleged criminal violation of the RICO statute. The draft indictment refers to a pattern of selling "illegally diverted and counterfeit" product. Acts supporting such claims were allegations of shipments of product in alleged violation of the 1990 Injunction.

45. L'Oreal's attempt to involve federal law enforcement was aimed at gaining leverage in this civil matter. An e-mail communication from Charles Domroe refers to a meeting between L'Oreal's outside counsel and representatives of the Unites States Attorney's Office and states the purpose of such meeting is "to see if criminal processes could be applied to help our pending civil lawsuit along its way."

46. A second e-mail communication from Domroe states that in the event that the federal officials decide to prosecute, it will "effectively put additional pressure on [Quality King to] accede to our position on what a civil settle should look like."

47. Minutes of a L'Oreal internal meeting refer to the dispute involving Quality King and state that L'Oreal's lawyers "will be seeking civil redress using the criminal contempt statutes as leverage."

48. L'Oreal insinuated the company so far into the proposed criminal aspect of this case as to offer to supply trucks and storage space to the federal government to aid in the execution of a warrant proposed by L'Oreal, to seize product from Quality King and Pro's Choice warehouses.

49. L'Oreal's offer of a free storage facility to the federal government was motivated, in no small part, by its desire to inspect the seized product.

50. L'Oreal took the position at trial that it refrained from commencement of civil proceedings because it did not want to interfere with an ongoing criminal investigation and it knew that the commencement of civil proceedings would somehow hamper the federal criminal effort. Yet, there was no evidence that the federal government instructed L'Oreal to refrain from going forward with its civil case. Instead, the court finds that the reason that L'Oreal delayed bringing its own civil contempt motion was its hope that a criminal action would be brought first and that such action would aid in an effort to extract favorable settlement terms.

51. Ultimately, no federal criminal action was brought. This prosecutorial decision is easily understandable in light of the facts that: (1) despite the draft indictment's reference to "counterfeit" product, there was never a supportable claim that the product sought to be seized was in any way adulterated so as to be a potential harm to the public and, (2) there was no evidence that the sale of Matrix products amounted to a violation of federal trademark law or the RICO statute.

52. The United States Attorney's office showed commendable judgment and ethics in deciding not to pursue this matter, especially in light of the fact that the request to prosecute originated from a former supervisor in that office.

VI. <u>Comparison of the 1990 Diversion Market with The Current Market</u>

53. In 1990, Quality King was the largest seller of diverted professional hair care products, having virtually no competition in that market.

54. In 1990, no competitor of Quality King was selling Matrix product to large chain stores.

55. Quality King's market position was attributable, in 1990, to its unique ability to obtain enough inventory to supply large chain stores with product on a continuing basis.

56. 1990 competitors of Quality King were able to supply only small amounts of Matrix product to retailers.

57. Matrix introduced at trial several letters sent to small retailers found to be selling Matrix products to the public. Those letters represented the effort by Matrix to stop diversion in the 1990 market.

58. Testimony and letters established that in 1990, Matrix worked to stop diversion primarily by sending letters and buying back small quantities of Matrix product from small retailers. Purchases of Matrix products from these retailers ranged from $10 to $1500 to a single high purchase from a non-Quality King distributor of $20,000.

59. The purchase of Matrix products from Quality King as part of the Florida Action was $1.4 million worth of product. Testimony established that this was a significant amount of product so as to have made a difference in the Matrix business. Testimony from a former director of Asset Protection at Matrix established that in 1990, the retail sale to the public of the Matrix product at issue in the Florida Action would have ruined the brand.

60. Currently, Quality King and Pro's Choice are in direct competition with several distributors engaged in the business of selling diverted product to large stores throughout the country.

61. Current sales of the Matrix brand dwarf the size of the brand in 1990. This is demonstrated by the sheer volume of diverted product alone, which in 2006 amounted to approximately $90 million worth of business to L'Oreal.

62. While the court finds that Matrix attempted, in 1990, to maintain the professional nature of the Matrix brand, the court finds, as referred to above, that such efforts are no longer genuinely pursued by L'Oreal.

63. Based upon the foregoing, the court finds that the current diversion market for Matrix, both in terms of the number of distribution companies and size of the market, is markedly different from the 1990 market.

## CONCLUSIONS OF LAW

I. <u>Rule 60(b)</u>

64. Rule 60(b) of the Federal Rules of Civil Procedure ("Rule 60(b)") provides that a court may relieve a party from a final judgment or order if it is no longer equitable that the judgment should have prospective application or any other reason justifying relief. Fed. R. Civ. P. 60(b).

65. A party seeking modification of a consent decree bears the burden of establishing that a "significant" change in circumstances warrants the change requested. <u>Rufo v. Inmates of the Suffolk County Jail</u>, 502 U.S. 367, 383 (1992).

66. The final clause of Rule 60(b), allowing for relief from an order for "any other reason justifying relief," "confers broad discretion on the trial court to grant relief

14

when appropriate to accomplish justice [and] it constitutes a grand reservoir of equitable power to do justice in a particular case. Matarese v. LeFevre, 801 F.2d 98, 106 (2d Cir.1986) (citations and quotation marks omitted).

67. Rule 60(b) is properly invoked where the order "may work an extreme and undue hardship" and "should be liberally construed when substantial justice will thus be served." Matarese, 801 F.2d at 106 (citation and quotation marks omitted).

II. The Legality of the Sale of Diverted Products

68. Claims alleging trademark and unfair competition must be supported by a showing of a likelihood of consumer confusion as to the origin of goods. Polymer Tech. Corp. v. Mimran, 37 F/3d 74, 78 (2d Cir. 1994); see Matrix Essentials v. Emporium Drug Mart, Inc., 988 F.2d 587, 590 (5th Cir. 1993); Farouk Sys., Inc. v. Target Corp., Inc., 2006 WL 2583449 *2 (S.D. Tex. 2006).

69. Under the "first sale" doctrine, long a basic premise of trademark law, a trademark owner cannot control distribution of a trademarked item beyond its first sale. The re-sale of such genuine goods does not create consumer confusion and supports neither a claim of infringement nor unfair competition. Sebastian Internat'l. Inc. v. Longs Drug Stores Corp., 53 F.3d 1073, 1074 (9th Cir. 1995) (noting first sale doctrine established even "long before" enactment of Lanham Act in 1946); Matrix Essentials, 988 F.2d at 593; Matrix Essentials, Inc. v. Cosmetic Gallery, Inc., 870 F. Supp. 1237, 1251 (D.N.J. 1994); Farouk, 2006 WL 2583449 *2; see Prestonettes, Inc. v. Coty, 264 U.S. 359 (1924).

70. In cases strikingly similar to the case here, courts have held consistently that claims of trademark infringement do not lie. Indeed, leading cases in this area

15

have involved the re-sale of so-called professional hair care products and/or Matrix and/or Pro's Choice and Quality King. In each case, the court has found no liability on the part of the distributor. See, e.g., Matrix Essentials, 988 F.2d 587, 593 (affirming district court grant of summary judgment where retailer merely re-sold Matrix product); Matrix Essentials, Inc. v. Cosmetic Gallery, Inc., 870 F. Supp. 1237, 1251 (D.N.J. 1994) (noting grant of summary judgment to defendants on claims of trademark infringement and unfair competition); Farouk, 2006 WL 2583449 (product distributed by Pro's Choice) cf. Quality King Distribs., Inc. v. L'Anza Research Int'l, Inc., 523 U.S. 135, 152 (1998) (importation and re-sale of genuine copyrighted goods, manufactured in United States, and later sold outside within United States, but outside of authorized chain of distribution is protected under first sale doctrine so as not to violate copyright law).

71. Arguing that the state of the law has changed dramatically since 1990, Defendants cite to a single 1989 case, entitled Matrix Essentials, Inc. v. Pro Beauty Supply, in which Matrix prevailed. That case is referred to in a 1990 document in evidence in this case in which Matrix touted its victory after a jury trial held in Tampa, Florida. The facts of that case are not before the court. To the extent that the case failed to apply the first sale doctrine in a matter involving the sale of genuine goods, the court finds the case to be outside of the step of the law at the time of entry of the 1990 Injunction.

72. In view of the long standing first sale doctrine, the court holds that there has been no real change in federal trademark law since entry of the 1990 Injunction.

73. The sale of genuine, unadulterated product beyond the first sale to distributors and outside of the professional chain of distribution was and remains entirely legal.

III. Disposition of the Rule 60(b) Motion

74. For the reasons that follow, the court exercises its discretion to hold that it is no longer equitable for the 1990 Injunction to have prospective application and that, therefore, the Rule 60(b) motion should be granted.

75. The court gives little weight to the fact that there has been no dramatic change in trademark law since entry of the 1990 Injunction. This is primarily due to the fact that principals of equity militate against continuing application of the injunction, but also because the basic legal premise upon which this case was commenced is different from the facts that are presently before the court.

76. This case was commenced on the premise that the Quality King Defendants acted in violation of the settlement agreement in the Florida Action. The Matrix product involved in that action was alleged to have been purchased outside of the country and all product was to have been re-sold to Matrix. The complaint herein alleged that the Quality King Defendants held back a portion of that product for re-sale. Such re-sale would have been a clear violation of the settlement agreement in the Florida Action and would have supported, at the very least, a breach of contract action. Additionally, as originally framed, the complaint in this action supports at least an arguable position that the product at issue was somehow sub-standard.

77. It is unclear whether the Quality King Defendants were in breach of the Florida Action settlement when they agreed to entry of the 1990 Injunction, but they

17

agreed, very shortly after institution of this lawsuit, the settle according to its terms.

78. While this court did, indeed, "so order" the 1990 Injunction, that order followed neither discovery, a hearing nor trial. Indeed, there were virtually no proceedings before the court and no findings of fact nor conclusions of law. The court agreed merely to implementation of the parties' agreement.

79. Presently, the alleged breach of the settlement agreement before the court in 1990 is no longer at issue. Nor is there any claim that the product being sold to the public is anything other that genuine. The facts, the conduct of the parties, and the market presently before the court are dramatically different from the facts that were before the court in 1990.

80. The facts, as they exist now, provide absolutely no basis in federal law for holding Pro's Choice or the Quality King Defendants liable for sale of genuine Matrix product. This weighs heavily in favor of declining the request to enforce the 1990 Injunction.

81. There is no doubt in the court's mind that the underlying legality of the conduct at issue is precisely why L'Oreal has chosen to proceed only on the basis of the alleged violation of the injunction. Had L'Oreal brought an action alleging trademark infringement or unfair competition today, that action would have likely been dismissed upon a finding that the product sold was genuine.

82. While it is certainly L'Oreal's right to proceed in this fashion, the court must consider the state of the law when considering whether equity requires that the 1990 Injunction be enforced. Upon that consideration, the court holds that equity

does not favor enforcement of the 1990 Injunction for all time. Such enforcement would take Pro's Choice out of competing in a market that it has grown, while others remain free to engage in the same business.

83. The court also considers L'Oreal's conduct when deciding whether equity favors continuing application of the injunction. L'Oreal's attempt to involve federal law enforcement authorities in this matter was, at best, disingenuous. L'Oreal must have known when it presented the draft indictment, that the sale of genuine product did not involve a violation of civil law, much less criminal law. L'Oreal also knew that the product being distributed by Quality King and/or Pro's Choice was genuine product obtained from L'Oreal's distributors. Yet, L'Oreal included the term "counterfeit" in the draft indictment.

84. L'Oreal was also aware of the slender reed upon which any claim of a criminal RICO violation rested. It is telling that L'Oreal never sought to amend the complaint in this action to set forth a civil RICO claim. Apparently, the company was willing to have the government allege a criminal violation of RICO, based only upon the allegation that there was a violation of consent decrees in civil lawsuits, but was unwilling to sign a complaint here alleging a civil violation of RICO.

85. As evidenced by the United States' Attorneys' office failure to pursue this matter, there was simply no public interest in prosecution of a criminal action. Nor is there an equitable interest in lifetime enforcement of the 1990 Injunction.

86. The present application asks the court to enforce the 1990 Injunction, for all time, simply because it exists. This is the first time the court has been called upon to

consider all facts and the law surrounding Plaintiffs' allegations. Upon such consideration the court cannot, in equity, hold that enforcement is warranted. The underlying legality of the conduct of Quality King and Pro's Choice, the lack of any harm to the public, and L'Oreal's conduct all militate against enforcement of the 1990 Injunction. Accordingly, the court grants the motion, pursuant to Rule 60(b), to set aside the 1990 Injunction.

## CONCLUSION

For the foregoing reasons the court grants the motion, pursuant to Rule 60(b), to set aside the injunction entered by this court in 1990. The injunction is therefore vacated. In light of this holding, it is unnecessary to determine whether Plaintiffs' action is barred by laches. Since the second phase of the trial would have addressed the issue of L'Oreal's standing to enforce the injunction and whether the Pro's Choice Parties are bound thereto, the holding that the injunction is vacated renders phase two unnecessary. The Clerk of the Court is directed to terminate all outstanding motions and to close the file in this case.

SO ORDERED.

_____
LEONARD D. WEXLER
UNITED STATES DISTRICT JUDGE

Dated: Central Islip, New York
November 13, 2007